IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>RANULFO ANTONIO JUAREZ-<br>HERNANDEZ,<br><br>　　　　Defendant. | No. CR15-0007<br><br>REPORT AND RECOMMENDATION |

TABLE OF CONTENTS

I.　　INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.　　PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.　　RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.　　DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
　　A.　　Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
　　B.　　Curtilage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
　　C.　　Probable Cause and Arrest in Public Place. . . . . . . . . . . . . 10
　　D.　　Exigent Circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . 13
　　E.　　Consent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
　　F.　　Inevitable Discovery. . . . . . . . . . . . . . . . . . . . . . . . . . . 18
　　G.　　Fruit of the Poisonous Tree. . . . . . . . . . . . . . . . . . . . . . . 22

V.　　SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VI.　　RECOMMENDATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## I. INTRODUCTION

On the 10th day of March 2015, this matter came on for hearing on the Motion to Suppress (docket number 12) filed by the Defendant on February 27, 2015. The Government was represented by Special Assistant United States Attorney Erin R. Eldridge. Defendant Ranulfo Antonio Juarez-Hernandez appeared in person and was represented by his attorney, Cory Goldensoph.

## II. PROCEDURAL HISTORY

On January 27, 2015, Defendant Ranulfo Antonio Juarez-Hernandez was charged by Indictment with conspiracy to distribute and possess with intent to distribute marijuana (Count 1) and possession with intent to distribute marijuana (Count 2). Defendant appeared on February 5 and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on April 6, 2015.

On February 27, 2015 Defendant timely filed the instant motion to suppress. The Government filed its resistance on March 6, 2015. Because of the pending motion to suppress, the trial was continued to May 18, 2015.

## III. RELEVANT FACTS

In February 2014, officials at Homeland Security Investigations ("HSI") contacted officials at the Drug Enforcement Agency ("DEA") office in Cedar Rapids about a package being sent by Federal Express ("FedEx") from El Paso, Texas, to Urbana, Iowa. The package, addressed to Pablo Garnica, arrived at the FedEx hub in Urbana on February 14. Special Agent Tyler Mower of HSI obtained a search warrant for the package. The package contained a water heater. Inside the water heater, officers found 37 wrapped bricks of marijuana, weighing approximately 85 pounds.

The officers removed all but ten of the marijuana bricks and filled the void with cardboard boxes. The water heater was then resealed and made available for delivery. On the morning of the 18th, Defendant and two other men arrived at the FedEx hub in two

vehicles and retrieved the package. Officers then followed Defendant and the others to a residence in northeast Cedar Rapids.

Upon arriving at the residence, the vehicles containing Defendant and the two other men pulled into the driveway and stopped near a detached garage.[1] Officers observed the men unload the package and put it in the garage. The men did not close the garage door, so officers were able to observe the activities within the garage by driving back-and-forth on the street. Special Agent David Poe of the DEA testified that officers observed the men opening the package. Because they were concerned that evidence may be destroyed or lost, the officers then walked up the driveway, identified themselves as law enforcement officers, and entered the garage. Defendant and the other men were arrested and the remaining marijuana was seized.

Defendant was given a *Miranda* warning in Spanish by Special Agent David Hoagland of HSI. Defendant told officers that the mother of his children lived at that residence, but he "stayed there at times and had access to the house." Defendant gave verbal consent to search the house and signed a consent form in Spanish.[2] Officers then searched the house, although the record is silent regarding whether they found any contraband.

Maria Luna testified at the hearing that she resides at the house where these events occurred. Luna has known Defendant since 2003 and they have two children, ages 9 and 6. According to Luna, she and Defendant dated "off-and-on" over the years. When these events occurred in February 2014, Defendant was staying at the house three or four nights

---

[1] A photograph of the house and garage were introduced as Government's Exhibit 1.

[2] The Spanish consent form was introduced as Government's Exhibit 2. An English translation of the form was introduced as Government's Exhibit 3. Defendant apparently concedes that Exhibit 3 is an accurate translation of Exhibit 2.

per week. Defendant had personal items, including clothes, in the house and garage. Luna admitted that she contacted law enforcement after the search, asserting that because Defendant's name was not on the lease, she believed he lacked authority to consent to a search. Luna and Defendant got married sometime after these events.

## IV. DISCUSSION

In his motion to suppress, Defendant asserts that the warrantless entry into the garage was violative of the Fourth Amendment. In his brief, Defendant argues that evidence obtained following the warrantless entry, including his "identity" and statements made by any of the men, should be suppressed. In its resistance, the Government cites seven reasons why it believes the motion should be denied.

### A. Standing

Preliminarily, the Government argues that Defendant lacks standing to challenge the officers' entry onto the property.[3] Maria Luna lived at the house full-time. Ms. Luna

---

[3] There is some confusion regarding whether Defendant's entitlement to challenge the search is properly referred to as "standing." In *United States v. Gomez*, 16 F.3d 254 (8th Cir. 1994), the Eighth Circuit Court of Appeals found the defendant had no expectation of privacy in the vehicle searched, citing *Rakas v. Illinois*, 439 U.S. 128 (1978), and, therefore, had "no standing to challenge the legality of the search." *Id.* at 156. However, in *Minnesota v. Carter*, 525 U.S. 83 (1998), the Supreme Court was critical of the Minnesota Supreme Court for analyzing the issue as one of "standing."

> The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in *Rakas*, 439 U.S., at 139-140, 99 S. Ct. 421.

*Id.* at 87. The Court noted that in *Rakas*, it found that the "definition of those [Fourth Amendment] rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Id.* at 88 (quoting *Rakas*, 439 U.S. at 140).

(continued...)

4

leased the property, and it was occupied primarily by her and Defendant's two children. However, Defendant told the officers that he "stayed there at times and had access to the house," and Luna testified that when these events occurred in February 2014, Defendant was staying at the house three or four nights per week.

"Fourth Amendment rights are personal and may not be vicariously asserted." *United States v. Bearden*, _____ F.3d _____, 2015 WL 1188729 (8th Cir.) at \*3 (filed March 17, 2015). "A person challenging the constitutionality of a search must

---

[3](...continued)
The Eighth Circuit Court of Appeals discussed this change in *United States v. Sturgis*, 238 F.3d 956 (8th Cir. 2001).

> In 1998, the Supreme Court reaffirmed its earlier rejection of "standing" nomenclature. *Minnesota v. Carter*, 525 U.S. 83, 87-88, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998). Beginning in *Rakas v. Illinois*, 439 U.S. 128, 139-140, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), and continuing in *Carter*, the Court replaced the standing inquiry with a new vocabulary tailored to the principles that undergird the Fourth Amendment. *See Carter*, 525 U.S. at 88, 119 S. Ct. 469. In *Carter*, the Court declared that "a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable . . ." *Id.*

*Id.* at 958. Accordingly, the issue is not one of "standing," but rather one of substantive Fourth Amendment law and whether Defendant had a reasonable expectation of privacy.

The Court notes, however, that in the recent case of *United States v. Bearden*, _____ F.3d _____, 2015 WL 1188729 (8th Cir.) (filed March 17, 2015), the government argued that the defendant lacked standing to challenge the search of his neighbor's property. After discussing whether the defendant had a legitimate expectation of privacy in the property being searched, the Court agreed with the magistrate judge that the defendant "lacked standing to challenge the officers' entry" onto his neighbor's property. *Id.* at \*4.

demonstrate a reasonable expectation of privacy in the particular area to be searched." *Id.* To show he had a legitimate expectation of privacy in the garage, Defendant must show "(1) he himself asserted a subjective expectation of privacy in the place searched or object seized, and (2) his subjective expectation is objectively reasonable." *Id.* "The first question is a question of fact, the second is a question of law." *Id.*

In *Bearden*, the defendant "presented no evidence to show he 'asserted a subjective expectation of privacy' in [his neighbor's] property." *Id.* at *4. In fact, his neighbor told officers that he did not know Bearden personally, and Bearden described his neighbor only as his landlord. *Id.* The Court concluded there was "nothing in the record to support the conclusion that he held a reasonable expectation of privacy" in his neighbor's property and, therefore, the defendant lacked "standing" to challenge the officers' entry onto his neighbor's property. *Id.*

Here, Defendant told officers that he stayed at the house "at times" and had "access" to the house. Ms. Luna testified Defendant was staying at the house three or four nights per week at that time. The record is silent regarding whether Defendant stayed at the house the night before these events on February 18, 2014. It is clear that "an overnight guest in a house had the sort of expectation of privacy that the Fourth Amendment protects." *Minnesota v. Carter*, 525 U.S. 83, 89 (1998) (citing *Minnesota v. Olson*, 495 U.S. 91 (1990)). However, "one who is merely present with the consent of the householder" may not claim the protections of the Fourth Amendment. *Id.* at 90.

In *United States v. Pollard*, 215 F.3d 643 (6th Cir. 2000), the Court concluded that one of the defendants had "standing" to contest the search because he was long-time friends of the lessee, had been staying at the home earlier in the week, and "occasionally spent the night at the residence and kept some personal belongings in a closet in the living room." *Id.* at 647. The Court further concluded, however, that another defendant lacked standing to contest the search because he was a "mere visitor" to the residence. *Id.* at 648.

6

Here, Defendant was apparently staying at the property approximately half the time and kept personal belongings at the property, including in the garage. He had a long-time relationship with the lessee, and she is the mother of his two children. (They got married after these events.) While the issue is not without some doubt, I believe Defendant's declaration to police that he "stayed there at times and had access to the house" establishes a subjective expectation of privacy in the property. Moreover, I believe Defendant's subjective expectation was reasonable. Accordingly, I conclude that Defendant had a legitimate expectation of privacy in the garage and, therefore, has "standing" to challenge the constitutionality of the warrantless entry.

## B. Curtilage

Next, the Government argues that the open, detached garage does not fall within the curtilage of the home and, therefore, is not afforded Fourth Amendment protection. "The area 'immediately surrounding and associated with the home' — what our cases call the curtilage — is regarded as 'part of the home itself for Fourth Amendment purposes.'" *United States v. Bausby*, 720 F.3d 652, 656 (8th Cir. 2013) (quoting *Florida v. Jardines*, _____ U.S. _____, 133 S. Ct. 1409, 1414 (2013)). *See also United States v. Weston*, 443 F.3d 661, 666 (8th Cir. 2006) ("The Fourth Amendment's protection extends to the curtilage surrounding a home.").

"Determining whether a particular area is part of the curtilage of an individual's residence requires consideration of 'factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself.'" *Bausby*, 720 F.3d at 656 (quoting *United States v. Boyster*, 436 F.3d 986, 991 (8th Cir. 2006)). Each case is unique, and there is no clear-cut rule for determining whether a particular location falls within the curtilage of a home and, therefore, is afforded Fourth Amendment protection. However, the Court has identified four factors which may be considered in determining whether the area is curtilage: "the proximity of the area

claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* (quoting *United States v. Dunn*, 480 U.S. 294, 300 (1987)). "These factors are not applied mechanically or in isolation." *Id.* (quoting *United States v. Gerard*, 362 F.3d 484, 487 (8th Cir. 2004)).

Here, the garage — while detached — is located in close proximity to the house. While the record is silent regarding precise distances, a photograph of the area (Government's Exhibit 1) suggests that the corner of the house is only a few feet from the corner of the garage. This factor weighs in favor of finding the garage is protected curtilage. However, the property has no fences or other barriers which obstruct a view of the garage from the public street. (Again, the record is silent regarding precise distances, but it would appear from the photograph that the garage is approximately four or five car lengths from the street.) Moreover, the occupants of the house took no steps "to protect the area from observation by people passing by." The house is situated perpendicular to the street. That is, the front door of the house faces the driveway, rather than the street. As a consequence, it is necessary for anyone approaching the front door of the house to walk up the driveway. These factors weigh against a finding that the garage is protected curtilage.

In *United States v. Lakoskey*, 462 F.3d 965 (8th Cir. 2006), the Court recognized that "[t]he absence of a closed or blocked gate in this country creates an invitation to the public that a person can lawfully enter along the driveway during daylight hours to contact the occupants for a lawful request and if the request is refused to leave by the same way." *Id.* at 973 (quoting *United States v. Ventling*, 678 F.2d 63, 66 (8th Cir. 1982)). *See also Nikolas v. City of Omaha*, 605 F.3d 539, 545-46 (8th Cir. 2010) (recognizing that a city

official, acting without a warrant, "could enter the property through its open gate and proceed up the driveway to the front door of the main residence").

Accordingly, it is clear that the officers were free to walk up the driveway on the property and approach the front door of the residence. *United States v. Wells*, 648 F.3d 671, 679 (8th Cir. 2011) ("No Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors — such as driveways, walkways, or similar passageways."). In this case, however, the officers did not stop at the front door of the house, but rather proceeded to the garage, where they were able to observe Defendant and the others through the open garage door.

Viewing the exterior of the garage while proceeding up the driveway required no warrant. *Nikolas*, 605 F.3d at 546 (citing *Air Pollution Variance Bd. v. W. Alfalfa Corp.*, 416 U.S. 861, 864-65 (1974)). Similarly, I believe officers were free to observe the interior of the garage through the open garage door, when standing in an area which was generally accessible to the public. *California v. Ciraolo*, 476 U.S. 207, 213 (1986) ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares."). In this case, however, the officers did not simply approach the garage and make visual observations; instead, they entered the garage through the open door.

I recognize that the Eighth Circuit Court of Appeals has held, under other circumstances, that a garage is not part of the protected curtilage. For example, in *United States v. Gerard*, 362 F.3d 484, 487-88 (8th Cir. 2004), the Court concluded that the defendant's garage, which did not lie within the fence surrounding the farmhouse, did not fall within the protected curtilage of the house. Similarly, in *United States v. Mooring*, 137 F.3d 595, 596 (8th Cir. 1998), the Court found that a barn located 40 to 50 yards

from the farmhouse was not used "for intimate activities of the home" and was outside of the farmhouse's curtilage.

After considering all of the circumstances, I believe that *entry* into the garage is protected by the Fourth Amendment. I believe the garage in this case is properly considered as curtilage of the home. The garage is located immediately adjacent to the house, was used to store personal property, is capable of being closed from public view, and is generally associated with the "sanctity of a man's home and the privacies of life." *Oliver v. United States*, 466 U.S. 170, 180 (1984). Even if there is an implied invitation for visitors to the property to walk up the driveway and approach the front door, it does not follow that visitors are invited to poke around the nearby garage. However, even *if* the garage is *not* considered curtilage, I nonetheless believe that entering the garage — as opposed to merely looking through windows — is protected by the Fourth Amendment. In other words, if the officers had visited the property on some other occasion — when the door to the garage was not open and no one was present — it cannot be argued that they were permitted to enter the garage on the theory that it was not protected curtilage.

### C. Probable Cause and Arrest in Public Place

The Government next argues that there was no constitutional violation because the officers had probable cause to arrest Defendant and the arrest occurred in a "public place." It would seem undisputed that the officers had probable cause to arrest Defendant.[4] Law enforcement knew that the package retrieved from the FedEx terminal by Defendant and the other two men contained contraband. The officers followed Defendant and observed the men unload the package in the garage. Because the men did not close the garage door, officers driving back and forth on the street observed the men opening the package.

---

[4] Defendant did not file a reply brief and, therefore, his response to the Government's arguments is unknown.

Probable cause to arrest "exists when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested." *United States v. Oropesa*, 316 F.3d 762, 768 (8th Cir. 2003) (quoting *United States v. Hartje*, 251 F.3d 771, 775 (8th Cir. 2001)). In his brief, Defendant seems to concede that probable cause existed to believe Defendant was in possession of a controlled substance, arguing that "it would have been quite simple and quick to 'cut and paste' the previous narrative to the new warrant and add the additional information regarding the police following the vehicles to the house."[5]

The warrantless arrest of an individual in a public place upon probable cause does not violate the Fourth Amendment. *Mitchell v. Shearrer*, 729 F.3d 1070, 1074 (8th Cir. 2013) (citing *United States v. Watson*, 423 U.S. 411, 423-24 (1976)). Because there was probable cause to arrest, the issue becomes whether Defendant was arrested in a "public place." In support of its argument, the Government cites *United States v. Santana*, 427 U.S. 38 (1976). In that case, as police arrived at her residence, Santana was "standing in the doorway of the house." As the officers approached, Santana "retreated into the vestibule of her house." "The officers followed through the open door, catching her in the vestibule." *Id.* at 40. The Court concluded that for Fourth Amendment purposes, Santana was in a "public place" because "[s]he was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Id.* at 42. The evidence in the instant case suggests that while Defendant was entirely within the garage when the officers approached, the garage door was open and Defendant — like Santana — was "exposed to public view" as completely as if he "had been standing completely outside."

---

[5] Defendant's Brief (docket number 12-1) at 3.

The Government also cites *Vajk v. Tindell*, 139 F.3d 902, 1998 WL 60391 (C.A. 7 (Ill.)) (unpublished). In that case, the defendant was standing "either within Brown's open garage or outside on Brown's driveway." *Id.* at *3. In either event, "Vajk was exposed to the public at the time of his arrest." *Id.* The Court concluded that the defendant was lawfully arrested because "[a] person does not have a legitimate privacy interest when he knowingly exposes himself to the public." *Id.* Here, Defendant knowingly exposed himself to the public by leaving the garage door open and acting while clearly visible to the street.

In *Mitchell*, the Eighth Circuit Court of Appeals addressed this issue in the context of a § 1983 action. The plaintiff claimed he was unlawfully arrested. It was undisputed the officer had probable cause to arrest the plaintiff, and the issue was "whether Mitchell was arrested in his home or in a public place." There, Mitchell responded to the front door when a law enforcement officer knocked to investigate a complaint by a neighbor. Mitchell opened the home's interior door, but remained in the house, while the officer opened the storm door. Mitchell was unwilling to discuss the matter, and as he began to close the inside door, the officer stuck his foot into the doorway, preventing the door from closing. 729 F.3d at 1072. The Court concluded that "a jury could find that Mitchell was within his home — standing far enough away from the threshold to allow the interior door to swing mostly shut and maintaining a reasonable expectation of privacy — when [the officer] began to effectuate the arrest." *Id.* at 1075. Accordingly, the plaintiff had "set forth sufficient facts to show a violation of his Fourth Amendment right to be free from unreasonable searches and seizures." *Id.* at 1076. *Mitchell* is distinguishable from the facts in this case, however, because he was not "exposed to public view" until he responded to police knocking on his door.

The government also cites *United States v. Dukes*, 2008 WL 2600296 (E.D. Pa.). There, the officer had probable cause to arrest the defendant for selling drugs. When officers arrived, the defendant was "on the threshold" of the garage door. As officers approached, the defendant attempted to close the garage door, but the officer, "who was also outside of the garage door," blocked the defendant's attempt to do so. *Id.* at *2. The Court concluded the officer approached the defendant in a "public place" to arrest him, based on probable cause that the defendant was distributing drugs. However, because the defendant in *Dukes* was outside the garage, the facts are distinguishable from those presented here.

Turning to the facts in the instant action, there is no evidence that Defendant "retreated" into the garage. That is, Defendant was apparently in the garage when officers approached the property, and remained in the garage until officers entered the garage and placed him under arrest. The garage door was open, however, and Defendant was "exposed to public view" the entire time. *Santana*, 427 U.S. at 38. I believe Defendant in this case, standing a few feet inside the garage with the garage door open, did not have a reasonable expectation of privacy. *Mitchell*, 729 F.3d at 1075. Accordingly, I believe the officers were permitted to enter the garage through the open garage door in order to effect a warrantless arrest based on probable cause. The result on this issue may be different if the garage door was closed, but it wasn't. Accordingly, I agree with the Government that the arrest occurred in a "public place" and was not violative of the Fourth Amendment.

## D. Exigent Circumstances

Alternatively, the Government argues that even if the arrest did *not* occur in a public place, the officers were nonetheless permitted to enter the garage and effect an arrest based on exigent circumstances. As set forth above, I believe Defendant was arrested in a "public place" and, therefore, a showing of exigent circumstances is not

required. Nonetheless, I will address the issue of exigent circumstances in the event the district court disagrees with my "public place" analysis.

The Fourth Amendment protects persons against unreasonable searches and seizures. Warrantless searches and seizures inside a home — or in this case a garage within the curtilage of the home — are presumptively unreasonable. *Kentucky v. King*, _____ U.S. _____, 131 S. Ct. 1849 (2011) (citing *Brigham City v. Stuart*, 547 U.S. 398 (2006)). However, because the "ultimate touchstone of the Fourth Amendment is 'reasonableness,'" the warrant requirement is subject to certain reasonable exceptions. *Id.* at 1856. "One well-recognized exception applies when 'the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'" *Id.* (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)).

The Supreme Court has identified several exigencies that may justify a warrantless search of a home, including the "emergency aid" exception, "hot pursuit" of a fleeing suspect, and "to prevent the imminent destruction of evidence." *Id.* It is the latter exigency upon which the Government rests its argument here. The Court noted in *King*, however, that there is an exception to the exigent circumstances rule, called the "police-created exigency" doctrine. *Id.* at 1857. Recognizing this exception, "the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable." *Id.* at 1858.

In *United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005), the Court noted that "[t]he risk that evidence will be destroyed during the time required to obtain a search warrant can be an exigent circumstance that justifies a warrantless entry." *See also United States v. Cisneros-Gutierrez*, 5908 F.3d 997, 1004 (8th Cir. 2010). In a typical case, however, officers hear noises behind a closed door or have other information suggesting that there is a danger of removal or destruction of evidence. *Leveringston*, 397

F.3d at 1113; *Cisneros-Gutierrez*, 598 F.3d at 1004. Here, because they left the garage door open, the officers were able to see what Defendant and the other two men were doing. While Defendant and the others were opening the package and attempting to access the contraband, there is no evidence they were was attempting to destroy the marijuana or remove it. *If* Defendant or the others had taken any steps to destroy or remove the contraband, it would have been readily observed by the officers.

The Eighth Circuit Court of Appeals has addressed circumstances where law enforcement removed some drugs from a package and then delivered the remaining drugs to the intended recipient. In *United States v. Duchi*, 906 F.2d 1278 (8th Cir. 1990), UPS employees discovered a package containing two bricks of cocaine. Law enforcement officers removed one of the cocaine bricks, replaced it with a book, and then made it available for pick up at the UPS office. After the package was picked up, officers followed the recipient to her home. "Mindful of Duchi's earlier behavior of disposing of drugs when alerted to police surveillance, and that he was probably in the house with the drugs, the officers feared that the evidence of Duchi's crime was in danger." *Id.* at 1280. Accordingly, the officers decided to enter the home without a warrant. "The Magistrate recommended, and the District Court found, that the officers' entry was justified by an exigent circumstance: the officers' reasonable fear that the evidence would be destroyed before a search warrant could issue." *Id.* at 1282. The Eighth Circuit Court of Appeals reversed. The government argued that by replacing one of the cocaine bricks with a book, Duchi would have known that "the jig was up as soon as he opened the parcel." *Id.* at 1284. According to the argument, once the package was inside the home and "probably in his hands," there was a risk that the evidence would be destroyed and the officers were justified in entering the home without a warrant. The Eighth Circuit Court of Appeals rejected the argument.

> This rationale misunderstands the exigent-circumstances exception to the Fourth Amendment's warrant requirement. We have recently held, adopting the view consistently taken by our sister circuits, that the situations of urgency protected by this exception cannot be created by police officers.

*Duchi*, 906 F.2d at 1284.

The Court addressed a similar issue in *United States v. Johnson*, 12 F.3d 760 (8th Cir. 1994). There, United States postal officials found a package containing 18 plastic bags of crack cocaine, wrapped in a sweater. The inspectors removed all but one of the bags and replaced them with a bag of taffy. Postal inspectors also inserted a beeper in the package, which would indicate when the package had been opened. The package was then delivered to the intended recipient. Initially, law enforcement intended to obtain a search warrant for the residence. Within minutes following the delivery, however, the beeper indicated that the package had been opened. "Fearing that evidence would be destroyed, the inspectors decided to enter the residence without waiting for the search warrant to be issued." *Id.* at 762. While finding that the postal inspectors reasonably believed that the evidence was in danger of being destroyed unless they immediately entered the residence, the Eighth Circuit Court of Appeals also found that "the inspectors themselves created that danger." *Id.* at 764. That is, "the heightened danger that the evidence would be destroyed was the probable result of the officers' removal and replacement strategy." *Id.*

Similarly, when law enforcement officers in the instant action removed 27 of the 37 marijuana bricks, replacing them with cardboard boxes, they knew or should have known that the persons opening the package would immediately discover that the contents had been disturbed. This may or may not raise a likelihood that the remaining ten marijuana bricks would be removed or destroyed. In any event, "the heightened danger that the evidence would be destroyed was the probable result of the officers' removal and replacement strategy." *Id.* The officers may not rely on an exigency which they have

created to justify a warrantless entry to a protected location. *Duchi*, 906 F.2d at 1284. Moreover, under the circumstances in this case, the officers could actually *see* what Defendant and the others were doing. There is no evidence that they were about to remove or destroy contraband. Rather, they were simply observed opening the package.

As set forth above, I believe Defendant was arrested in a "public place" because he failed to close the garage door, was exposed to public view the entire time, and did not have a reasonable expectation of privacy. However, if the district court finds Defendant was *not* arrested in a public place, then I believe the "destruction of evidence exigency" argued by the Government fails.

### E. Consent

As a further fallback position, the Government argues that Defendant's consent to search the house "purged the taint of any illegal entry" into the garage.[6] It should be recalled that after the officers entered the garage and arrested Defendant, they sought permission to search the house. Defendant gave verbal permission to search, and also signed a Spanish consent form (Government's Exhibit 2). Defendant does *not* claim that his consent was involuntary. Accordingly, the issue becomes whether Defendant's voluntary consent to search the house validates the officers' prior warrantless entry into the garage.

In support of its argument, the Government cites *United States v. Lakoskey*, 462 F.3d 965 (8th Cir. 2006). In that case, the Court found that the officers violated the Fourth Amendment by twice entering the defendant's house without a warrant. However, the defendant subsequently consented to the officers searching the house. The Court noted that its finding that the entries into the defendant's home were illegal "does not end our analysis." *Id.* at 974. The Court must also consider "whether Thomas's subsequent

---

[6] Government's Resistance (docket number 16-1) at 14.

consent to let the officers search his house dissipated the taint of the initial illegal entry."
*Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)). "When a consent to
search follows an illegal entry the government must show more than the voluntariness of
the consent; it must also demonstrate that the taint of the initial entry has been dissipated
in order to admit evidence seized following the illegal entry." *Id.* at 975 (quoting *United
States v. Snype*, 441 F.3d 119, 132 (2d Cir. 2006)).

> In determining whether a person's consent purged the taint of
> the illegal entry, we consider such factors as "(1) the giving of
> *Miranda* warnings, (2) the 'temporal proximity' of the illegal
> entry and the alleged consent, (3) 'the presence of intervening
> circumstances,' and (4) 'the purpose and flagrancy of the
> official misconduct.'"

*Lakoskey*, 462 F.3d at 975 (quoting *Snype*, 441 F.3d at 132). The district court in
*Lakoskey* found that the defendant's consent after the illegal entry was voluntary. The
Court of Appeals concluded, however, that even *if* the consent was voluntary, "we hold
that such consent did not 'right the officers' constitutional wrong,' because '[the
defendant's] acquiescence came immediately on the heels of the illegal entry.'" *Id.*

Similarly, Defendant's consent to search in the instant action came immediately
following the officers' entry into the garage. While Defendant was apparently given a
*Miranda* warning prior to giving consent to search, I believe that *if* the officers' entry into
the garage was otherwise unlawful, the taint of the initial illegal entry is not cured by
Defendant's subsequent consent to search the house.

### F. Inevitable Discovery

Next, the Government argues that even if the officers had not approached and
entered the garage when they did, the contraband would have been "inevitably discovered"
because it is likely the officers would have applied for and obtained a search warrant.

In *Nix v. Williams*, 467 U.S. 431 (1984), the Court adopted the inevitable discovery
doctrine, which it described as "closely related" to the independent source doctrine. Both

18

doctrines constitute exceptions to the exclusionary rule generally associated with police misconduct. Under either doctrine, evidence is not excluded if it "would put the police in a worse position than they would have been in absent any error or violation." *Id.* at 443. Exclusion of evidence that would have been inevitably discovered would "put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place." *Id.* at 444.

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense.

*Nix*, 467 U.S. at 444.

To prevail under the inevitable discovery exception to the exclusionary rule, the government must establish "(1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir.2008) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir.1997)).

I believe the first prong of the test is easily met. That is, even if the officers had not entered the garage when they did, there is a reasonable probability they would have obtained a search warrant authorizing them to search the house and garage. Indeed, Defendant concedes in his brief that "it would have been quite simple and quick" for the officers to obtain a search warrant.[7] Determining whether the Government has established the second prong of the inevitable discovery test, however, is more problematic. That is,

---

[7] Defendant's Brief (docket number 12-1) at 3.

the Government must show that it "was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation."

I pause to note that in his concurring opinion in *United States v. Thomas*, 524 F.3d 855 (8th Cir. 2008), Judge Colloton is critical of the Eighth Circuit's formulation of the test used to apply the inevitable discovery doctrine. Citing *Nix*, Judge Colloton asserts that the Eighth Circuit's test is both overinclusive and underinclusive. The first prong requires a "reasonable probability" that the evidence would have been discovered by lawful means. Judge Colloton points out, however, that the Supreme Court in *Nix* spoke of evidence that "ultimately or inevitably" would have been discovered. *Id.* at 861 (quoting *Nix*, 467 U.S. at 444). On the other hand, the second prong of the Eighth Circuit test — demanding that the government be actively pursuing a "substantial, alternative line of investigation" — is, in Judge Colloton's view, underinclusive. That is, Judge Colloton asserts that even if the police were not pursuing some other line of investigation, "the government may well be able to establish that the execution of routine police procedure or practice inevitably would have resulted in discovery of disputed evidence." *Id.* at 862. Judge Colloton urged the Court to align itself with the majority of circuits which have abandoned the second prong. While Judge Colloton's critique of the Eighth Circuit's test for inevitable discovery seems well-reasoned, I am, of course, bound by Eighth Circuit precedent. Another panel of the Eighth Circuit recently noted Judge Colloton's criticism, but the test nonetheless remains unchanged. *See United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012).

Accordingly, for the inevitable discovery doctrine to apply, it is not enough that the Government show there was a reasonable probability the officers would have obtained a search warrant for the house and garage. In addition, the Government must show that law enforcement "was actively pursuing a substantial, alternative line of investigation" when officers entered the garage. I believe it is unable to do so here.

In *Thomas*, officers were looking for a suspect in a shooting death, who was expected to be on a bus arriving in Cedar Rapids. The officers approached Thomas (who was not the man they were looking for) and illegally reached into his back pocket and pulled out a bus ticket. The bus ticket enabled the officers to obtain Thomas' true identity, and he was arrested pursuant to an outstanding warrant. A search incident to arrest found a substantial amount of crack cocaine in his bag. The Court found that discovery of the bus ticket was inevitable. "The 'substantial, alternative line of investigation' the officers were conducting was whether the man they were speaking to was Lane, the stop could not be concluded until police discovered Thomas's true identity." 524 F.3d at 859.

More recently, the Eighth Circuit Court of Appeals found in *McManaman* that both prongs of the inevitable discovery doctrine were satisfied. In that case, officers went to McManaman's home to execute an arrest warrant on gun and drug charges. Following his arrest, officers conducted a search of the house and found child pornography, among other things, in the basement. After opining that it was "an exceedingly close question," the Court concluded that both prongs of the inevitable discovery doctrine were satisfied.

> The second prong of the doctrine is also established. Apart from arresting defendant McManaman on an arrest warrant, upon finding drug paraphernalia on his person, the officers were engaged in ascertaining defendant McManaman's current involvement with drugs. The Court finds such substantial, alternative line of investigation satisfies the test in this case.

*McManaman*, 673 F.3d at 845.

Turning to the facts in the instant action, there is no evidence that the Government "was actively pursuing a substantial, alternative line of investigation." The only reason the officers' attention was drawn to the house and garage was by following Defendant after he picked up the suspect package at FedEx. That is, there is no evidence that the officers were conducting an investigation of Defendant or the residence prior to these events.

*Compare United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008). I believe there is a "reasonable probability" that if they had not entered the garage when they did, the officers would have sought and received a search warrant. Under the test formulated by the Eighth Circuit, however, that is not enough. The two-prong test — which has been criticized by Judge Colloton — also requires that the officers were actively pursuing a substantial, alternative line of investigation. That second prong is not met here. Accordingly, the Government is unable to rely on the inevitable discovery doctrine to support admission of the evidence resulting from the arrest and subsequent search.

### G. Fruit of the Poisonous Tree

Finally, the Government argues that "even if the Court finds that a constitutional violation occurred, the fruit of the poisonous tree doctrine does not require suppression of the evidence."[8] In support of its argument, the Government cites *United States v. Villa-Velazquez*, 282 F.3d 553 (8th Cir. 2002), and *New York v. Harris*, 495 U.S. 14 (1990).

In *Harris*, officers entered the defendant's home, without a warrant and without consent, to investigate a murder. After being *Mirandized*, the defendant admitted killing the victim. The defendant was then arrested and taken to the station house, where he was again *Mirandized* and again made an inculpatory statement. It was undisputed, pursuant to *Payton v. New York*, 445 U.S. 573 (1980), that arresting Harris in his home without an arrest warrant violated the Fourth Amendment. *Id.* at 17. The trial court suppressed the statement given by Harris in his home, and the state did not challenge that ruling. That is, the sole issue on appeal was whether the second statement, given at the station house, should be suppressed because the police, by entering Harris' home without a warrant and without his consent, violated *Payton*. *Id.* at 16. In concluding that the second statement was admissible, the Court emphasized that it was obtained after the suspect had been

---

[8] Government's Brief (docket number 16-1) at 16.

lawfully arrested and removed from the house. "Because the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given *Miranda* warnings, and allowed to talk." *Id.* at 18. The Court would have reached a different conclusion, however, regarding the statement made at the defendant's house.

> To put the matter another way, suppressing the statement taken outside the house would not serve the purpose of the rule that made Harris' in-house arrest illegal. The warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded, *as it should have been*.

*Harris*, 495 U.S. at 20 (emphasis added).

In *Villa-Velazquez*, an officer entered the defendant's home, without a warrant, to place him under arrest for illegally re-entering the United States. "The government does not challenge the district court's holding that Ferguson's entry into Villa-Valazquez's home violated his Fourth Amendment rights, nor its ruling suppressing the evidence gathered while officers were in the residence." *Id.* at 556. Accordingly, *if* the officers' warrantless entry into the garage to arrest defendant on probable cause is violative of the Constitution, then I believe any evidence obtained in the garage, including any statement given by him following his arrest, is inadmissible.

Defendant argues that "evidence of someone's identity, illegally obtained, can be suppressed."[9] In support of his argument, Defendant cites *United States v. Guevara-Martinez*, 262 F.3d 751 (8th Cir. 2001). There, the defendant was a passenger in a car which was stopped illegally. Drugs were found in the car and the defendant was arrested. Following his arrest, authorities took the defendant's fingerprints and discovered he had

---

[9] Defendant's Brief (docket number 12-1) at 4.

been previously deported. After the drug charges were dismissed as a consequence of the illegal vehicle stop, the defendant was charged with unlawful re-entry into the United States. The Court concluded that the fingerprints obtained following the defendant's initial arrest were inadmissible in the subsequent action. The Government in this case argues, however, that *Guevara-Martinez* is distinguishable because the officers in this case had probable cause to arrest Defendant *before* the additional incriminating evidence was obtained in the garage.

The defendant in *Villa-Velazquez* argued that his identity information should also be suppressed "as fruit of the poisonous tree because it was obtained through the exploitation of the initial illegal entry into his home." *Id.* The Eighth Circuit rejected the argument, finding that "the evidence obtained during the time Villa-Velazquez was in lawful custody was not tainted by the earlier unlawful entry into his residence." *Id.* In *United States v. Quintana*, 623 F.3d 1237 (8th Cir. 2010), the Court concluded that identity evidence obtained by law enforcement was admissible, distinguishing *Guevara-Martinez* because "probable cause to believe that the defendants were deportable aliens was acquired *after* their illegal arrest and detention." *Id.* at 1241 (italics in original).

The officers in the instant action clearly had probable cause to arrest Defendant for possession of a controlled substance with intent to deliver. *If* the warrantless entry into the garage violated the Fourth Amendment, then incriminating evidence obtained in the protected location would be inadmissible. *Harris*, 495 U.S. at 20. Evidence regarding Defendant's identity, however, is admissible. *Quintana*, 623 F.3d at 1241.

## V. SUMMARY

In summary, I believe the garage in this case fell within the curtilage of the home and, therefore, was protected by the Fourth Amendment. I also believe Defendant's connection with the property was enough to confer standing to challenge any constitutional violation. The warrantless arrest of an individual in a public place upon probable cause

does not violate the Fourth Amendment. It is undisputed in this case that the officers had probable cause to arrest Defendant. Because Defendant failed to close the garage door, was exposed to public view the entire time, and did not have a reasonable expectation of privacy, I believe Defendant was arrested in a "public place." Accordingly, there was no constitutional violation and Defendant's *Mirandized* statement, together with the evidence obtained during a search incident to arrest, is admissible. Accordingly, the motion to suppress should be denied.

If the Court concludes that Defendant was *not* arrested in a "public place," however, I do not believe there were exigent circumstances which would authorize the officers' warrantless entry into the protected location. Similarly, I do not believe Defendant's subsequent consent to a search of the house validates the officers' earlier warrantless entry into the garage. Moreover, I do not believe the inevitable discovery doctrine would apply when there is no evidence the Government was actively pursuing a substantial, alternative line of investigation. *If* the officers' entry into the garage was unlawful, then evidence obtained at that location is fruit of the poisonous tree and inadmissible. Nonetheless, identity evidence relating to Defendant would not be suppressed.

## VI. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the Motion to Suppress (docket number 12) filed by Defendant be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections."*

*Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on February 27, 2015.*

DATED this ___3rd___ day of April, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA