IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RANULFO ANTONIO JUAREZ-HERNANDEZ,<br><br>Defendant. | No. CR15-0007<br><br>SUPPLEMENT TO REPORT AND RECOMMENDATION |

On the 26th day of May 2015, this matter came on for hearing on the Motion to Reopen the Suppression Hearing Record and for Reconsideration of the Ruling (docket number 33) filed by the Defendant on May 19, 2015. The Government was represented by Special Assistant United States Attorney Erin R. Eldridge. Defendant Ranulfo Antonio Juarez-Hernandez appeared personally and was represented by his attorney, Cory Goldensoph.

## I. PROCEDURAL HISTORY

On February 27, 2015, Defendant filed a motion to suppress. The motion came on for hearing before me on March 10. On April 3, I filed a Report and Recommendation, recommending that Chief Judge Reade deny Defendant's motion to suppress. The Government filed objections to the Report and Recommendation on April 16, and Defendant filed objections to the Report and Recommendation on April 17.

On May 19, 2015 — before Chief Judge Reade had ruled on the motion to suppress — Defendant filed the instant motion to reopen the hearing, asking me to reconsider my recommendation. Defendant asserts in his supporting brief that he received "new

information" from the Government on May 18, justifying reconsideration.[1] The matter was set for hearing, and the parties were advised that they would be permitted to offer additional evidence on the issue raised in the motion to reopen; *i.e.*, whether the garage door was only partially open at the time of these events. Both parties offered additional evidence on this subject at the instant hearing. The parties were advised that I would file a supplement to my Report and Recommendation, and the parties would then have 14 days in which to file additional objections.[2]

## II. RELEVANT FACTS

The facts underlying the instant action are set forth in my initial Report and Recommendation and will not be repeated in detail. As relevant to the instant motion, I found the following facts:

> Upon arriving at the residence, the vehicles containing Defendant and the two other men pulled into the driveway and stopped near a detached garage. Officers observed the men unload the package and put it in the garage. The men did not close the garage door, so officers were able to observe the activities within the garage by driving back-and-forth on the street. Special Agent David Poe of the DEA testified that officers observed the men opening the package. Because they were concerned that evidence may be destroyed or lost, the officers then walked up the driveway, identified themselves as law enforcement officers, and entered the garage. Defendant and the other men were arrested and the remaining marijuana was seized.

Report and Recommendation (docket number 22) at 3. In finding that Defendant's arrest occurred in a "public place," I noted that "[t]he garage door was open . . . and Defendant was 'exposed to public view' the entire time." *Id.* at 13. In addition, I observed that

---

[1] Defendant's Brief (docket number 38-1) at 3.

[2] Because of the pending motion to reopen and for reconsideration, it was necessary to continue the trial scheduled on June 3, 2015.

2

"[t]he result on this issue may be different if the garage door was closed, but it wasn't." *Id.*

In reaching my conclusion that the arrest occurred in a public place, it was my understanding that the garage door — which is estimated to be seven feet tall — was fully open. Evidence offered at the instant hearing, however, established that was not the case. Cedar Rapids Police Officer Bryan Furman, who is currently assigned to the DEA Task Force, testified that the garage door was open "to a significant degree," but was "not all the way up." According to Furman, the opening was "in the neighborhood" of four to five feet. Similarly, Investigator Sarah Lacina, who was also assigned to the DEA Task Force, estimated that the door was open approximately four feet. Lacina testified that she is five feet six inches tall, and the door was open to "chest level."

The officers confirmed, however, that they were able to see three subjects inside the garage "manipulating" the hot water heater as they approached. The hot water heater is only 30 inches tall, and the end cap had been removed.[3] This testimony is consistent with the testimony given by Special Agent David Poe of the DEA at the first hearing, when he testified that officers were able to observe the activities within the garage by driving back and forth on the street.[4] Specifically, Poe testified that officers observed the men opening the package.

---

[3] Photographs of the hot water heater were introduced as Government's Exhibits 4, 5, and 6.

[4] Defendant notes that because of the location of the house and garage, and because one or more cars were parked in the driveway, the activities in the garage may not have been noticed by a "casual observer." The observations of a police officer, however, are not so constrained. "As a general proposition, the police may see what may be seen 'from a public vantage point where they have a right to be.'" *Florida v. Riley*, 488 U.S. 448, 449 (1989) (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). The fact that the investigators in this case viewed the interior of the garage from the street with more than casual interest is of no consequence.

## III. DISCUSSION

The issue raised by Defendant's motion for reconsideration is whether my conclusion that Defendant was arrested in a "public place" is changed by the new evidence that the garage door was only partially open. As set forth above, I concluded that because the garage was completely open, and Defendant was fully exposed to public view, the arrest occurred in a public place. I also noted, however, that if the garage door had been closed, then the interior of the garage was clearly not a public place. The question then becomes: At what point does exposure to public view transform a private place into a public place? If the door is one foot up from the bottom, is that sufficient to make the interior of the garage a public place? If the door is one foot down from the top, does that transform the garage from a public place to a private place? What if the garage door is open approximately four feet?

I believe the answer to these questions requires an examination of whether there was a reasonable expectation of privacy attached to the interior of the garage when officers entered to effect Defendant's arrest. When considering the application of the Fourth Amendment in *Katz v. United States*, 389 U.S. 347 (1967), the Court focused on an expectation of privacy.

> [T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. (citations omitted) But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Katz*, 389 U.S. at 351. In *United States v. Santana*, 427 U.S. 43 (1976), the Court cited *Katz* in finding that a person standing in the "threshold" of her dwelling was in a "public" place. *Id.* at 42 ("She was not in an area where she had any expectation of privacy.").

In *Mitchell v. Shearrer*, 729 F.3d 1070 (8th Cir. 2013), a § 1983 action, the Eighth Circuit Court of Appeals was required to "determine whether Mitchell was arrested in his

4

home or in a public place." *Id.* at 1074. In resolving the issue, the *Mitchell* Court first cited *Santana*. However, the Court also noted that in *Duncan v. Storie*, 869 F.2d 1100 (8th Cir. 1989), it cautioned that it would be "unwise to become preoccupied with the exact location of the individual in relation to the doorway." *Id.* at 1075. Instead, a "crucial issue" involved the individual's reasonable expectation of privacy. *Id.*

Courts from other jurisdictions have applied a similar analysis. In *United States v. Hoyos*, 892 F.2d 1387 (9th Cir. 1989), an officer spotted the defendant looking over a gate on the side of his house. When the officer told him to "hold it right there," however, the defendant ran towards the back door of the house. The Ninth Circuit Court of Appeals found that "[i]ndividuals who voluntarily look over their backyard fence or gate and expose themselves to public view of anyone on the street cannot be said to be in an area where they have a reasonable expectation of privacy." *Id.* at 1394.

> Hoyos was under arrest from the time Deputy Love instructed him to stop. At that time Hoyos was looking out and over his fence exposing himself to public view of anyone on the street. Thus, Hoyos was in a "public place."

*Hoyos*, 892 F.2d at 1394. *See also United States v. Varkonyi*, 645 F.2d 453, 457 (5th Cir. 1981) ("Any area where there is no expectation of privacy is considered a 'public place' under the Fourth Amendment.").

In *Mallory v. City of Riverside*, 35 F. Supp. 3d 910 (S.D. Ohio 2014), officers went to a private home to investigate a report that the homeowner may be keeping chickens for the purpose of cockfighting. When approaching the residence, investigators heard "'unhealthy' screeching noises" coming from the garage. An officer "knocked on an already ajar door, which swung open providing a plain view of the interior of the garage and the crated animals." *Id.* at 930. In this § 1983 action, the magistrate judge found that because the door was ajar and swung open upon knocking, it "created a path of visibility to any curious passerby, and one which [the officer] could have observed in either his

citizen or official capacity." *Id.* at 931. Accordingly, the Court concluded that there was no Fourth Amendment violation.

In *United States v. Elkins*, 300 F.3d 638 (6th Cir. 2002), officers obtained a search warrant by peering through a one-inch opening in an exterior wall near a PVC pipe. The Court concluded that there was no Fourth Amendment violation when officers looked through the opening from an area where they were otherwise entitled to be. *Id.* at 654. While the defendants had a reasonable expectation of privacy in the interiors of their businesses, the Court concluded that it did not "insulate those spaces against plain view observation." *Id.* Moreover, the fact that the officer made a special effort to obtain his "view" did not change the analysis.

> Any contortions [the officer] made to peer through the opening did not change the "plain view" character of his observation. The fact "that the policeman may have to crane his neck, or bend over, or squat, does not render the plain view doctrine inapplicable, so long as what he saw would have been visible to any curious passerby."

*Elkins*, 300 F.3d at 654 (quoting *James v. United States*, 418 F.2d 1150, 1151 n.1 (D.C. Cir. 1969)). *See also United States v. Pace*, 955 F.3d 270 (5th Cir. 1992) (finding no Fourth Amendment violation when officers peered through a small opening in the back of a locked barn, which was not within the curtilage of the house).

Turning to the facts in the instant action, Defendant and his companions only partially closed the garage door.[5] By leaving the garage door open four or five feet, the

---

[5] In response to questioning by Ms. Eldridge, Officer Furman opined that "it would make the most sense for the garage to be open when individuals are unloading a package into the garage, to have the garage door open all the way." We know that the garage door was capable of being opened all the way, because Government's Exhibit 7 shows it all the way open. Accordingly, it is reasonable to infer that the garage door was opened all the way when Defendant and the others unloaded the package from the van, but they then partially closed the garage door, for whatever reason.

occupants of the garage exposed the interior of the garage to public view. Officers traveling on a public street were able to observe their activities. Accordingly, with the garage door open to that extent, there was no reasonable expectation of privacy to its interior. Because there was no reasonable expectation of privacy, the interior of the garage was a "public place" under the Fourth Amendment, and no warrant was required to enter and effect an arrest based on probable cause. *United States v. Watson*, 423 U.S. 411, 423-24 (1976). Therefore, my initial recommendation in this case — that the motion to suppress be denied — remains the same.

## IV. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the Motion to Suppress (docket number 12) filed by Defendant be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on and March 10 and May 26, 2015.*

DATED this 2nd day of June, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA